## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

ALLISON KESSINGER,

      Plaintiff,

v.                                      CIVIL ACTION NO. 2:24-cv-00432

WEST VIRGINIA STATE UNIVERSITY,
ERICKE S. CAGE, *President,*
THE BOARD OF GOVERNORS OF WEST VIRGINIA STATE UNIVERSITY,
MARK W. KELLY, *Board of Governors Chair,*
IAN FLORES, *Board of Governors Vice Chair,*
TRACY MCKIBBEN, *Board of Governors Secretary,*
DARREN GOODWIN, *Board of Governors Student Representative,*
W. LEE GREENHOWE, *Board of Governors Sales Leader,*
CHARLES E. JONES, JR., *Board of Governors Member,*
MICHAEL MCCLUNG, *Board of Governors Staff Representative,*
JAMES PAYNE, *Board of Governors Tax Manager,*
JEFF PIETRUSZYNSKI, *Board of Governors Faculty Representative,*
LESTER RAINES, *Board of Governors Owner,*
LATEFF Y. SAFFORE, *Board of Governors Member,*
KRYSTAL SMITH, *Assistant Vice President for Human Resources,*
ROBERT WALLACE, *Dean, College of Arts and Humanities,*
J. PAIGE CARNEY, *Provost and Vice President for Academic Affairs,*
JUSTIN MCCALLISTER, *Senior V.P. for Strategic Finance,
Operations, and Chief Innovation Officer, and*
MICHAEL FULTZ, *Associate Provost/Assistant Vice President Academic Affairs,*

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      Pending is Defendants West Virginia State University, The Board of Governors of West Virginia State University (collectively "WVSU"), Ericke S. Cage, Mark W. Kelly, Ian Flores, Tracy McKibben, Darren Goodwin, W. Lee Greenhowe, Charles E. Jones, Jr., Michael McClung, James Payne, Jeff Pietruszynski, Lester Raines, Lateff Y. Saffore, Krystal Smith, Robert

Wallace, J. Paige Carney, Justin McCallister, and Michael Fultz's (collectively "Defendants") Motion for Summary Judgment [ECF 29], filed April 1, 2025. On April 14, 2025, Plaintiff Allison Kessinger responded in opposition [ECF 32], to which Defendants replied [ECF 33] on April 22, 2025.[1]

## I.

From August 8, 2023, to May 14, 2024, Ms. Kessinger was employed by WVSU as a music instructor pursuant to a nine-month, term contract. [ECF 29-1 at 2]. Her appointment confirmation letter provided "[t]he appointment [was] for the period and purpose specified[,]" and "[n]o other interest or right [was] obtained by virtue of t[he] appointment." [*Id*. at 3].

In March 2024, Ms. Kessinger -- in her capacity as a WVSU faculty member -- accompanied her students on a choir trip to New York to perform concerts and recruit high school students interested in pursuing a music degree. [ECF 29-2 at 27:15-28:15]. Upon return, several students reported through WVSU's Title IX online reporting system and directly to Dr. Robert Wallace, Dean of the WVSU College of Arts and Humanities, that Ms. Kessinger had acted unprofessionally during the trip by threatening to leave, snapping at and failing to assist students, crying, and complaining. [ECF 31-2; ECF 31-4]. Students also reported inappropriate classroom behavior from Ms. Kessinger prior to the trip. [*Id*.]. Specifically, students reported Ms. Kessinger

---

[1] Also pending is Defendants' Motion to Seal [ECF 31] Exhibits C, D, and F to their Motion for Summary Judgment. These exhibits contain student identifying information and statements disclosed in the underlying, confidential Title IX investigation conducted by WVSU. Though redactions have been made to all student identifying information, Defendants assert the exhibits should remain sealed "to preserv[e] the integrity of the Title IX process and to maintain the interest in ensuring a safe and confidential Title IX process." [ECF 31-1 at 3]. Inasmuch as the right of public access is outweighed by the confidential nature of the Title IX investigation in these circumstances, the Court **GRANTS** the Motion [**ECF 31**] and **ORDERS** the exhibits [**ECF 31-2, 31-3, 31-4**] be **PROVISONALLY SEALED** pending further order of the Court.

had made odd remarks regarding her sex life and sexual preferences during lessons, at orchestra performances, in the hallway, in the rehearsal room, and in her office. [*Id*.; ECF 31-3; ECF 29-5 at 21:23-22:8]. Dr. Wallace promptly reported these complaints to WVSU's Title IX Coordinator, Dr. Carolyn Stuart, and the Title IX hotline. [ECF 29-5 at 22:24-23:15].

On or about April 4, 2024, Ms. Kessinger met with Dr. Stuart regarding the student complaints. [ECF 29-8]. On April 12, 2024, Ms. Kessinger received a Notice of Investigation and Allegations letter via email, providing her with formal notice of the allegations against her and ensuing investigation. [ECF 29-9]. The letter also provided Ms. Kessinger with, *inter alia*, a detailed overview of the investigative process, notice of all possible sanctions against both students and employees found to be in violation of Title IX, and a link to WVSU's applicable investigation procedures and her rights during the investigation. [*Id*.]. Additionally, the letter provided Ms. Kessinger notice of the two, neutral investigators assigned to the matter, and her right to choose an advisor to accompany her "to all meetings, interviews, and hearings and to assist [her] in t[he] process[.]" [*Id*. at 6]. On April 15, 2024, Ms. Kessinger was placed on administrative leave without pay pending the outcome of the Title IX investigation into her alleged misconduct. [ECF 29-7 at 3; ECF 17 at 16]. A No Contact Order was also put in place between Ms. Kessinger and one of the student complainants. [ECF 29-10].

On April 22, 2024, Dr. Stuart informed Ms. Kessinger via email that while the complainant students elected not to file a formal complaint, they nonetheless expressed concern with receiving continued instruction from Ms. Kessinger and feared retaliation. [ECF 29-8 at 2]. Given this information, Dr. Stuart advised Ms. Kessinger a Title IX investigation through the formal grievance process would yet ensue "as the conduct alleged and known circumstances surrounding the reported behaviors appear[ed] to potentially be sexual harassment toward students

by an employee." [*Id*. at 2]. Dr. Stuart thus initiated the grievance process by signing a formal, Title IX complaint in her capacity as WVSU's Title IX coordinator. [*Id*.]. The email also included a detailed explanation of Ms. Kessinger's rights during the investigation, including her (1) right to participate or not participate in the process, (2) "right to review all documents and reports connected with t[he] grievance process, including any notice, investigation report, hearing determination or related files," and (3) "right to have an Advisor of [her] choice to assist [her] throughout the process." [*Id*. at 2, 3]. She was also advised if she did not "have an Advisor for the Live Hearing the University w[ould] appoint one for cross-examination purposes only." [*Id*. at 3].

Between April and May 2024, at least four students and three faculty members were interviewed as part of the Title IX investigation. [*See* ECF 31-3 at 4-10]. On July 16, 2024, WVSU issued its formal Title IX Investigation Report (the "Report"), detailing summaries of these interviews and its conclusions. [ECF 31-3]. According to the Report, students reiterated Ms. Kessinger's purported unprofessionalism during the choir trip and recounted prior, sexually explicit conversations with Ms. Kessinger regarding her sexual encounters with her boyfriend and her sexual preferences. [*Id*.]. Two students also recounted Ms. Kessinger conversing about her boyfriend being an artist who "does 'furry porn'" and "draws inappropriate things for his clients." [*Id*. at 6, 7].

One student, however, voiced support for Ms. Kessinger. [*Id*. at 9-10]. She reported she believed the complaining students "may have taken a seed of truth and exaggerated it" for purposes of the Title IX investigation in retaliation for Ms. Kessinger's "annoying" behavior during the choir trip. [*Id*. at 9]. Though supportive, she also opined Ms. Kessinger "may need a little professional development" and admitted she "has a tendency to over share" but not to the level of a "fire-able offense." [*Id*]. Ms. Kessinger was also interviewed and adamantly denied

having sexually explicit conversations with or in front of students. [*Id*. at 6]. She later expressed her belief that the Title IX complaints were made in retaliation for her anxiety-induced behavior and "perceived shortcomings" on the choir trip. [ECF 29-7 at 2].

The Report ultimately concluded inasmuch as "[t]he parties [were] not in agreement regarding the alleged misconduct[,] . . . the hearing panel w[ould] be tasked with analyzing whether [Ms. Kessinger] did or did not, intentionally or inadvertently violate WVSU's Board of Governors" sexual harassment policy. [ECF 31-3 at 10]. It appears the Title IX investigation continued until its ultimate "permissive dismissal" on September 25, 2024. [ECF 32 at 5].

Prior to issuance of the July 16, 2024, Report, on May 14, 2024, while Ms. Kessinger was on administrative leave, her employment contract with WVSU expired and was not renewed. [ECF 29-1]. On June 1, 2024, Ms. Kessinger instituted this action in the Circuit Court of Kanawha County. [ECF 1-2]. On July 11, 2024, she received a letter from WVSU informing her employment had ended as she had not "been reappointed to the 2024-2025 academic year" and that the remainder of her owed payout would be disbursed on July 26, 2024.  [ECF 29-11].

On July 18, 2024, Ms. Kessinger amended her Complaint, alleging the following claims against all nineteen Defendants: Violation of Due Process Rights under the Fourteenth Amendment of the United States Constitution and Article III, Section 10 of the West Virginia Constitution (Count I), Retaliatory Suspension in violation of Title IX (Count II), Breach of Contract (Count III), Emotional Distress (Count IV), Wrongful Termination (Count V), and Retaliatory Termination in violation of Title IX (Count VI). [ECF 1-3].

Specifically, she alleges (1) her "suspension without a fair hearing or substantive evidence" deprived her of due process [*Id*. at ¶ 31], (2) her "unsubstantiated" suspension without pay was retaliatory [*Id*. at ¶ 36], (3) her suspension without pay breached "the implied contract of

employment," which includes "fair and just treatment," and her right to be informed of her employment status before March 1 [*Id.* at ¶¶ 38, 40, 41], (4) Defendants' "intentional, reckless, and outrageous" conduct caused her severe emotional distress [*Id.* at ¶ 44], (5) her wrongful termination was "in spite of contract, protocols, and vocal assurance" [*Id.* at ¶ 46], and (6) her termination after filing suit against Defendants was retaliatory. [*Id.* at ¶ 48]. As a result of these allegations, Ms. Kessinger seeks immediate reinstatement to her former position, past wages and lost benefits, compensatory damages, reimbursement of medical bills, injunctive relief "preventing Defendants from engaging in further retaliatory or discriminatory actions against [her]," and attorney fees and costs. [*Id.* at 10-11].

On August 19, 2024, the matter was removed. [ECF 1]. On April 1, 2025, Defendants moved for summary judgment on all claims. They contend summary judgment is warranted inasmuch as (1) Defendants are entitled to sovereign immunity or, alternatively qualified immunity, (2) Ms. Kessinger has identified no genuine issue of material fact as to any of her asserted claims, and (3) Ms. Kessinger failed to exhaust her administrative remedies, depriving the Court of subject matter jurisdiction over her state law claims. [*See* ECF 30 at 5]. Ms. Kessinger rejects these assertions and contends summary judgment is inappropriate.

## II.

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings."

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)).

The Court must "view the evidence in the light most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "The court . . . cannot weigh the evidence or make credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

## III.

### A.  *Count I: Section 1983 and Eleventh Amendment Immunity*

Title 42 U.S.C. § 1983 governs actions against state actors arising from their deprivations of constitutional rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law.

42 U.S.C. § 1983. Under most circumstances, however, the Eleventh Amendment bars § 1983 claims seeking money damages against states, their instrumentalities, and their agents in their official capacities. *See Lee-Thomas v. Prince George's Cty. Pub. Schs.*, 666 F.3d 244, 248-49 (4th Cir. 2012); *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).

Simply put, neither a state, its agents, nor its instrumentalities constitute "persons" under § 1983 and are thus immune from suit. *Id.*; *see also Fauconier v. Clarke*, 966 F.3d 265, 279-80 (4th Cir. 2020). "That is why 'in the context of lawsuits against state and federal employees or entities, courts should look to whether the sovereign is the *real party in interest* to determine whether sovereign immunity bars the suit.'" *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 433 (4th Cir. 2025) (emphasis in original) (quoting *Lewis v. Clarke*, 581 U.S. 155, 161-62 (2017)). "If the state is the 'real party in interest,' then the plaintiff's suit 'is truly against the sovereign' and the entity or official 'is entitled to invoke' sovereign immunity as if it were the sovereign itself." *Id.* "Whether the sovereign is the 'real party in interest' differs between suits against state entities and state officials;" thus, the Court addresses them separately herein. *Id.*

### 1. State Entity: WVSU

Defendants contend WVSU is a state agency and is therefore entitled to Eleventh Amendment immunity on Ms. Kessinger's Count I § 1983 claim. [*See* ECF 30 at 10-11]. Ms. Kessinger disagrees, asserting "[n]o statute exists nor has any [c]ourt ruled that the public university *is* a government agency[.]" [ECF 32 at 6 (emphasis in original)]. In support, she relies on the Elementary and Secondary Education Act of 1965 ("ESEA") and contends the ESEA "set the basic terms of the federal government's involvement in education[,] but "did not . . . establish that institutions of higher education [are] state [agencies]." [*Id*. at 9]. Ms. Kessinger's assertions are meritless.

"Only those entities considered to be 'an arm of the State' may invoke sovereign immunity." *Id*. (quoting *Alden v. Maine*, 527 U.S. 706, 756 (1999)). "Whether a state entity 'should be treated as an arm of the State' depends on 'the relationship between the State and the entity in question.'" *Id*. (quoting *Regents of the Univ. of Cal.*, 519 U.S. at 429-30). "Entities are considered

'arms of the State' if they, based on their particular legal and factual circumstances, '*function*[] as an arm of the State or its alter ego.'" *Singleton v. Maryland Tech. & Dev. Corp.*, 103 F.4th 1042, 1047 (4th Cir. 2024) (emphasis in original) (quoting *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)). In other words, "when the state entity is sufficiently dependent on and answerable to the state, the state will be the real party in interest, and the entity will be shielded by sovereign immunity." *Jackson Creek Marine, LLC*, 153 F.4th at 433.

In determining whether an entity functions as an arm of the State, our Court of Appeals has "articulated a 'nonexhaustive list' of four factors to be considered:

> (1) Whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
>
> (2) The degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, or who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) Whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) How the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make [it] an arm of the State."

*Singleton*, 103 F.4th at 1048 (internal citations omitted); *see also Ram Ditta v. Maryland Nat. Cap. Park & Plan. Comm'n*, 822 F.2d 456, 457-460 (4th Cir. 1987). As our Court of Appeals has repeatedly emphasized, however, "the most important consideration . . . is the first – *i.e.*, whether the state treasury will be responsible for paying any judgment that might be awarded." *Id.* (internal quotations and citations omitted).

Our Court of Appeals has observed that of the litany of courts tasked with determining "whether public universities are 'arms of the state[,] [a]lmost universally, the answer

has been in the affirmative." *Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 263-64 (4th Cir. 2005) (collecting cases). Additionally, West Virginia University, another public state university funded by federal land-grant -- analogous to WVSU -- is an arm of the State of West Virginia. *See W. Virginia Univ. Bd. of Governors ex rel. W. Virginia Univ. v. Rodriguez*, 543 F. Supp. 2d 526, 535 (N.D.W. Va. 2008) (holding "West Virginia University and its Board of Governors are arms and alter egos of the State of West Virginia"); Syl. Pt. 4, *Davari v. W. Virginia Univ. Bd. of Governors*, 245 W. Va. 95, 97, 857 S.E.2d 435, 437 (2021) (recognizing "[t]he Board of Governors of West Virginia University is a State agency, and, as such, is an arm of the State"). Nevertheless, "each university must be evaluated in light of its unique characteristics." *Id*. at 263 (internal citations and quotations omitted).

The Court notes one colleague in this District has concluded WVSU is an arm of the State. *See W. Virginia State Univ. Bd. of Governors for & on behalf of W. Virginia State Univ. v. Dow Chem. Co.*, No. 2:17-CV-3558, at *11 (S.D.W. Va. June 1, 2020) (Copenhaver, J.) (concluding "WVSU is properly considered an arm of the state under the *Ram Ditta* factors that control in this Circuit."), *aff'd sub. nom. and on other grounds*, *W. Virginia State Univ. Bd. of Governors v. Dow Chem. Co.*, 23 F.4th 288 (4th Cir. 2022). The Court finds no reason to deviate from this well-reasoned conclusion but will briefly analyze each factor below.

First, and most critical to the inquiry, Ms. Kessinger does not contest that were she to succeed on her claims, any judgment would be paid by the WVSU via the State Treasury absent insurance coverage. Second, WVSU lacks sufficient autonomy from the State to be considered independent thereof. For instance, (1) the majority of WVSU's board of governors are appointed by the Governor with the advice and consent of the Senate, W. Va. Code § 18B-2A-1(c)(2), (6), and are subject to removal by the Governor "only in a manner prescribed by law for the removal

of the state elective officers," W. Va. Code § 18B-2A-1(e)(3), (2) monies paid to or held by the University are considered state funds and may only be withdrawn via checks issued by the state treasurer, *Rodriguez*, 543 F. Supp. 2d at 533; *Dow Chem. Co.*, 2020 WL 2842057 at \*9; W. Va. Code § 12-3-1, and (3) WVSU's board of governors is required "to prepare an appropriations request to the West Virginia Higher Education Policy Commission ("HEPC"), the state's oversight agency for higher education," "prepare a schedule of all tuition and fees, file [it] with the HEPC, and certify the schedule to the Legislative Auditor," and "submit copies of its annual audited financial statements to the HEPC." *Dow Chem. Co.*, 2020 WL 2842057 at \*10 (citing W. Va. Code §§ 18B-2A-4(f), 18B-1B-1, 18B-1B-4(28), 18B-10-1(e), 18B-5-9(a)(3)).

Third, considering WVSU's designation as a public university and land-grant institution, it is axiomatic WVSU is involved in statewide concerns. Indeed, the Legislature has declared "public higher education . . . benefit[s] the citizens of the State of West Virginia" and "post-secondary education is vital to the future of West Virginia." W. Va. Code § 18B-1-1a(a), (c); *see also Maryland Stadium Auth.*, 407 F.3d at 265 (finding the plaintiff university's mission of "educating the youth of Maryland" to be a "clear[ ] area of statewide concern."). Furthermore, given WVSU's status as a land-grant institution, it "operates extension services related to agriculture, community and economic development, and family and consumer sciences at field offices in Fayette, Kanawha, Logan, Nicholas, Putnam, Raleigh, and Summers counties," all of which are quintessential areas of statewide concern. *Dow Chem. Co*, 2020 WL 2842057 at \*11.

Lastly, as previously mentioned, the Supreme Court of Appeals of West Virginia has consistently treated WVU, a public university akin to WVSU, as an arm of the State. *See, e.g.*, Syl. Pt. 1, *City of Morgantown v. Ducker*, 153 W. Va. 121, 168 S.E.2d 298, 299 (1969) (holding "[t]he Board of Governors of West Virginia University is a State agency, and, as such, is an arm

11

of the State[.]"); Syl. Pt. 1, *University of West Virginia Bd. of Trustees v. Graf*, 205 W. Va. 118,

516 S.E.2d 741 (1998) (same); Syl. Pt. 4, *Davari*, 245 W. Va. at 97, 857 S.E.2d at 437 (same).

Again, while these cases involve WVU as opposed to WVSU, the distinction is ultimately one

without difference in this context, given the analogous nature of both institutions. For instance,

both universities were founded by federal land-grant acts, are defined as "state institutions of

higher education" under *West Virginia Code* § 18B-1-2(27), and are regulated via their board of

governors under the same provisions of the *West Virginia Code*. *See* W. Va. Code § 18B-2-1

through § 18B-2A-8.

       In sum, the Court concludes WVSU is properly treated as an arm of the State under

the factors delineated above. But the inquiry respecting WVSU's entitlement to Eleventh

Amendment immunity does not end here. Indeed, "[t]he Eleventh Amendment bar to suit is not

absolute," inasmuch as at least "three exceptions exist to that constitutional bar." *Lee-Thomas*, 666

F.3d at 248-49; *see also In re S.C. Dep't of Parks, Recreation & Tourism*, 103 F.4th 287, 291 (4th

Cir.), *cert. denied sub nom., S.C. Dep't of Parks, Recreation & Tourism v. Google LLC*, 145 S. Ct.

572 (2024). "First, Congress may abrogate the States' Eleventh Amendment immunity when it

both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority."

*Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 746 n.2 (4th Cir. 2018) (internal quotations

omitted). Second, "a state may waive its Eleventh Amendment immunity." *Id*. And third, "the *Ex*

*Parte Young* exception applies to a suit against a state official acting in violation of state law." *Id*.

       Ms. Kessinger does not seek to avail herself of any of these three exceptions, nor

does the Court find any of the exceptions applicable to WVSU. Respecting the first, it is well-

established Congress has not abrogated Eleventh Amendment immunity in the context of a § 1983

action. *In re Sec'y of Dep't of Crime Control & Pub. Safety*, 7 F.3d 1140, 1149 (4th Cir. 1993)

(recognizing "[w]hile Congress may abrogate a State's Eleventh Amendment immunity by express statutory language, it has long been settled that 42 U.S.C. § 1983 . . . does not effect such abrogation."). As to the second, there is no indication the State has waived its immunity to suit. And, inasmuch as the third exception is only implicated by state officials, it is inapplicable to WVSU. Accordingly, as an arm of the State, WVSU is entitled to Eleventh Amendment immunity. Ms. Kessinger's Count I § 1983 claim against WVSU thus fails as a matter of law.

## 2. Individual Defendants

State "[o]fficials can be sued in either their official capacity or individual capacity." *Jackson Creek Marine*, 153 F.4th at 433. Individual or personal capacity suits do not "raise the specter of sovereign immunity" inasmuch as they seek "to impose individual liability upon a government officer, with any judgment or personal damages to be applied to the officer or the officer's wallet." *Id*. (internal quotations and citations omitted). On the other hand, "'suits against state officials in their official capacity' are 'treated as suits against the State' and are thus barred by sovereign immunity to the extent they seek monetary relief." *Gibbons v. Gibbs*, 99 F.4th 211, 214 (4th Cir. 2024) (cleaned up) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)); *see also Jackson Creek Marine*, 153 F.4th at 433-34 ("Sovereign immunity only ever comes into question with an official-capacity suit, and only when the office is part of the state or an arm of the state."). But, as briefly mentioned above, "there is also a well-settled corollary—associated with *Ex parte Young*, 209 U.S. 123 . . . (1908)—that allows suits 'for declaratory or injunctive relief against state officers in their official capacities.'" *Id*. (quoting *Reed v. Goertz*, 598 U.S. 230, 234 (2023)).

"'The *Ex parte Young* exception 'allows suits against state officers for prospective equitable relief from ongoing violations of federal law.'" *Doe v. University of North Carolina System*, 133 F.4th 305, 318 (4th Cir. 2025) (quoting *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir.

2001)). "In such suits, 'sovereign immunity does not apply because an official who acts unconstitutionally'—or otherwise violates federal law—'is 'stripped of his official or representative character.'" *Jackson Creek Marine*, 153 F.4th at 434 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). "In such circumstances, the state official is no longer considered an official of the state." *Id*. Simply put, "official-capacity suits seeking prospective relief for federal-law violations do not implicate sovereign immunity but all other official-capacity suits do." *Id*. "To determine whether a suit may proceed under *Ex parte Young*, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Doe*, 133 F.4th at 318 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

As a threshold matter, "when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Biggs v. Meadows*, 66 F.3d 56, 61 (4th Cir. 1995); *see also Gregory v. Currituck Cnty.*, No. 21-1363, 2022 WL 1598961, at *2 (4th Cir. May 20, 2022). Inasmuch as Ms. Kessinger's Complaint lacks any such specification, a determination must be made as to whether the individual Defendants are being sued in their official or individual capacities. Our Court of Appeals has recognized the following factors for consideration in undertaking this examination: (1) whether "the plaintiff[] fail[ed] to allege that the defendant acted in accordance with a governmental policy or custom, or the lack of indicia of such policy or custom on the face of the complaint," (2) whether the plaintiff sought "compensatory or punitive damages, since such relief is unavailable in official capacity suits," and

(3) whether the defendant has raised a qualified immunity defense, indicating "the defendant interpreted the plaintiff's action as being against him personally." *Id*.

Respecting the first, while Ms. Kessinger's Complaint omits allegations that Defendants acted in accord with a specific policy or custom, it is equally devoid of allegations respecting each individual Defendants' purported conduct as related to Count I or any other claim. Second, while Ms. Kessinger seeks compensatory damages, she also seeks injunctive relief, rendering the factor neutral. [*See* ECF 1-3 at 10-11]. And third, while the individual Defendants have raised the qualified immunity defense, they do so in the alternative to sovereign immunity, which, like the second, renders the third factor of little assistance in the inquiry.

Of note, however, Ms. Kessinger does not dispute Defendants' contention they have been sued in their official capacities. [*Compare* ECF 30 at 10-11 (asserting inasmuch as "[t]here have been no facts developed that created a genuine dispute of material fact as to any individual Defendant . . . it is clear that the individual Defendants are being sued solely because of the official positions each held at the time of [Ms. Kessinger]'s placement on administrative leave and contract renewal[,]" and are thus immune from suit) *with* ECF 32 at 7 (contesting Eleventh Amendment immunity inasmuch as the individual "Defendants are not state officials.")]. Additionally, though not alone dispositive, Ms. Kessinger identifies all seventeen individual Defendants in the Complaint by name, followed by their designated position at the University. [*See* ECF 1-3 at ¶¶ 3, 5-19]. Considering the foregoing -- most significantly, Ms. Kessinger's failure to contest the individual Defendants' official capacity assertion -- the Court finds Ms. Kessinger's claims are asserted against the individual Defendants in their official capacities.

While the individual Defendants' official capacity designation would -- under most circumstances -- entitle them, as state actors, to Eleventh Amendment immunity, Ms. Kessinger's

asserted injunctive relief invokes the *Ex parte Young* exception earlier mentioned. Ms. Kessinger seeks reinstatement to her former position and an injunction preventing Defendants from engaging in further retaliatory or discriminatory conduct against her, both of which constitute prospective, injunctive relief. The Court will thus consider the merits of Ms. Kessinger's asserted procedural due process claim against the individual Defendants.

Ms. Kessinger claims the individual Defendants denied her procedural due process by suspending her from her position "without a fair hearing or substantive evidence."[2] [ECF 1-3 at ¶ 31].[3] In her briefing, without citation to the record, she additionally asserts she was "suspended on the basis of an allegation," "denied pay [and] . . . benefits," "denied the right to confront her student accuser(s)," and "denied the opportunity to confront the individual that filed the complaint." [ECF 32 at 12-13]. She also contends -- again, without evidentiary support -- that she "was denied the same opportunity to effectively defend herself that was offered to past respondents in that she alone . . . was suspended without pay." [*Id*. at 13].

"Due process is guaranteed by the Fourteenth Amendment, which prohibits states from depriving any person of life, liberty, or property without due process of law." *Todman v. Mayor & City Council of Baltimore*, 104 F.4th 479, 487 (4th Cir. 2024). To establish a procedural due process violation under § 1983, a plaintiff must show "(1) that [she] w[as] deprived of a cognizable liberty or property interest, (2) through some form of state action, (3) with constitutionally inadequate procedures." *Id*. (citing *Iota Xi Chapter of Sigma Chi Fraternity v.*

---

[2] Notably, though Ms. Kessinger asserts this claim against all sixteen individual Defendants, both her Complaint and briefing are devoid of any factual allegations regarding each individual's personal involvement in the asserted deprivation. This deficiency aside, however, Ms. Kessinger's claim yet fails as explained in detail below.

[3] Ms. Kessinger's claim only challenges the sufficiency of the process provided prior to her suspension, not her subsequent termination; thus, only the former is addressed.

*Patterson*, 556 F.3d 138, 145 (4th Cir. 2009)). Where an employee holds a cognizable property interest in her employment, "[a]t a minimum, due process requires that [the] employee be given notice of the charges against h[er] and 'some kind of a hearing' before being disciplined by suspension." *Garraghty v. Jordan*, 830 F.2d 1295, 1300 (4th Cir. 1987) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 533 (1985) (citing *Roth*, 408 U.S. at 569-70)).

Ordinarily, such "'hearing,' though necessary, need not be elaborate." *Loudermill*, 470 U.S. at 545. Generally, "'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 343 (1976)). Indeed, our Court of Appeals has recognized "[a] pre-deprivation proceeding need not be a full evidentiary hearing with witnesses and a neutral decision maker so long as the employee is given an opportunity to answer the charges." *Garraghty*, 830 F.2d at 1302; *see also Gilson v. Pennsylvania State Police*, 676 F. App'x 130, 134 (3d. Cir. 2017) (explaining an employee with a protected property interest in continued employment "is entitled only to notice of the charges against h[er], an explanation of the employer's evidence, and an opportunity to present h[er] side of the story.").

Although Ms. Kessinger fails to identify a specific liberty or property interest,[4] the Court assumes she possessed a cognizable property interest in her employment with WVSU -- at least until the point her term contract expired on May 14, 2024, -- that triggered due process protection. *See Roth*, 408 U.S. at 576-77 (1972) ("[I]n the area of public employment, . . . college professors and staff members dismissed during the terms of their contracts . . . have interests in continued employment that are safeguarded by due process."); *Palotai v. University of Maryland*,

---

[4] Confusingly, Ms. Kessinger merely asserts "[t]he interest at issue in this matter is the right to procedural due process." [ECF 32 at 12].

38 F. App'x 946, 952 (4th Cir. 2002) (assuming university employee "had a cognizable property interest in his job that triggered the protection afforded by the Due Process Clause."). Nonetheless, she has failed to demonstrate with supporting evidence that her suspension was constitutionally deficient.

To the contrary, a review of the evidentiary record -- even when viewed in the light most favorable to Ms. Kessinger -- demonstrates she was provided the pre-deprivation process due prior to her April 15, 2024, suspension, namely, notice of the Title IX allegations against her, an explanation of those allegations, and an opportunity to respond. As mentioned in detail above, on or about April 4, 2024, Ms. Kessinger attended an in-person meeting with Dr. Stuart, during which she was provided notice of the student allegations and an opportunity to present her side of the story. [*See* ECF 29-7 at 11]. Ms. Kessinger concedes as much in her subsequent written statement to Dr. Stuart, -- dated as "written April 2-10, 2024" -- wherein she again defends herself against the allegations against her. [*See id.* ("I met with Dr. Stuart at the time that she requested. I told her everything that I have written in this statement, and answered her questions.")].

Moreover, on April 12, 2024, Ms. Kessinger was provided with a detailed, written letter from Dr. Stuart titled "Notice of Investigation and Allegations," again advising her of the allegations and ensuing Title IX investigation. [ECF 29-9]. At bottom, given that Ms. Kessinger was provided notice of the allegations, an explanation of those allegations, and an opportunity to respond, the requirements of due process were satisfied. Ms. Kessinger has adduced no evidence creating a genuine issue of material fact to the contrary. Accordingly, the individual Defendants are entitled to summary judgment on Ms. Kessinger's Count I procedural due process claim asserted under § 1983.

**B.**     *Counts II & VI: Title IX Retaliatory Suspension & Termination*

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Although Title IX does not expressly provide a cause of action for retaliation, the Supreme Court has ruled that 'the private right of action implied by Title IX encompasses claims of retaliation.'" *Roe v. Marshall University Bd. of Governors*, 145 F.4th 561, 569 (4th Cir. 2025) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005)); *see also Jackson*, 544 U.S. at 174 (concluding "when a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX."). For guidance in evaluating a retaliation claim under Title IX, courts "look to Title VII of the Civil Rights Act of 1964 to provide an applicable legal framework." *Id*. (citing *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018)).

"To succeed on a retaliation claim under the Title IX framework, a plaintiff must show (1) 'that [she] engaged in a protected activity under Title IX' and (2) 'that – as a result of [her] protected activity – [she] suffered an adverse action attributable to the defendant educational institution.'" *Id*. Protected activities under Title IX include actions taken to oppose sex discrimination, such as reporting sexual harassment or filing a lawsuit against an employer for contravention of Title IX. *Jackson*, 544 U.S. at 180 (providing "[r]eporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished"); *Hurley*, 911 F.3d at 694 ("protected activities included advocating against and reporting sexual harassment, plus filing…complaint[s].").

First, insofar as the individual Defendants are concerned, it is well-established "Title IX allows for lawsuits against only educational institutions or programs[.]" *Hurley*, 911 F.3d at 700; *see also Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 257 (2009) (recognizing "Title IX reaches institutions and programs that receive federal funds, . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals[.]"). Ms. Kessinger's Title IX retaliation claims as asserted against the individual Defendants thus fail as a matter of law.

Second, as to WVSU, Ms. Kessinger's retaliation claims collapse at the outset as she has failed to establish her engagement in a Title IX protected activity prior to her suspension or termination. Indeed, Ms. Kessinger was the individual *accused* of Title IX misconduct, not the individual reporting it. She is thus unable to establish her suspension or termination by WVSU was in retaliation *because* she complained of sex discrimination or otherwise took action to oppose it. *See Jackson*, 544 U.S. at 184 (recognizing that to succeed on the merits of his Title IX retaliation claim, "[plaintiff] will have to prove that the [defendant] retaliated against him *because* he complained of sex discrimination." (Emphasis in original)). The mere filing of Ms. Kessinger's Title IX claims under these circumstances thus cannot satisfy the protected activity requirement, entitling WVSU to summary judgment on Counts II and VI.

## C.    *Counts I, III, IV, V: Supplemental Jurisdiction of Remaining State Law Claims*

Under 28 U.S.C. § 1367(c)(3), a district court retains discretion to decline exercising supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3); *see also Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024). A district court possesses "'wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been

20

extinguished.'" *Henderson*, 102 F.4th at 251 (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)).

Upon dismissal of all federal claims, a district court may "decline to exercise jurisdiction over any remaining pendant state law claims by dismissing those claims without prejudice" or remanding those claims to state court. *Id.* (quoting *Banks v. Gore*, 738 F. App'x 766, 733 (4th Cir. 2018)); *Archie v. Nagle & Zaller, P.C.*, 790 F. App'x 502, 505 (4th Cir. 2019) (citing *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616–17 (4th Cir. 2001)). Nonetheless, in exercising this discretion, consideration should be given to the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and . . . judicial economy." *Shanaghan*, 58 F.3d at 110 (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

Considering the Court's dismissal of Ms. Kessinger's federal claims as explained in the rulings above, remand of the remaining state law claims is warranted as the same presents no apparent unfairness or inconvenience to either party, nor hindrance to judicial economy. Accordingly, the Court declines to exercise supplemental jurisdiction over Ms. Kessinger's state law claims and will remand those claims to the Circuit Court of Kanawha County for consideration.

## IV.

Based on the foregoing discussion, Defendants' Motion for Summary Judgment [**ECF 29**] is **GRANTED** as to Ms. Kessinger's federal law claims asserted in Counts I, II, and VI. Ms. Kessinger's remaining state law claims asserted in Counts I, III, IV, and V are **REMANDED** to the Circuit Court of Kanawha County in accord with the Court's discretion under 28 U.S.C. § 1367(c)(3).[5]

---

[5] In light of these rulings, the following Motions are **DENIED AS MOOT**: (1) Defendants' Motion in Limine to Exclude Expert Opinions and Evidence of Any Medical Treatment [**ECF 36**],

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER: February 6, 2026

Frank W. Volk
Chief United States District Judge

---

(2) Ms. Kessinger's Motion for Leave to File Amended Rule 26 Disclosures [**ECF 38**], (3) Defendants' Motion for Inspection of Juror Questionnaires [**ECF 46**], and (4) Ms. Kessinger's Motion for Scheduling Order [**ECF 53**].

22